PATTERSON, P. J., and CLARKE, J., concurred; HOUGHTON and LAMBERT, JJ., dissented.

Judgment reversed, new trial ordered, costs to appellant to abide event.

---

In the Matter of the Application of the CITY OF NEW YORK, Relative to Acquiring Title, etc., to the Lands Required for the Widening of Delancey Street on the Southerly Side from Clinton Street to the Bowery in the Tenth and Thirteenth Wards in the Borough of Manhattan, City of New York.

LUCIUS H. BEERS and ELI G. PARTRIDGE, as Executors, etc., of ROBERT R. STUYVESANT, Deceased, Appellants; ADOLPH SCHLESSINGER, Respondent.

First Department, July 15, 1907.

Eminent domain — award to tenant.

In ascertaining the respective interests of a landlord and tenant in real property taken by eminent domain the following methods should be adopted:

The fair market value of the whole premises should be first ascertained, which amount is the sum total to be awarded. The actual market value of the leasehold as a whole should then be determined and awarded to the tenant, the dif-

ference between that value and the total value measuring the award of the landlord.

In ascertaining the value of a leasehold the same rule should be applied as in ascertaining the market value of the property as a whole. The tenant's interest in the lease as a whole should be determined in the light of the rent he has paid and his rights and obligations under the lease.

The value of buildings erected by the tenant and which become part of the freehold should not be treated as a separate entity to the value of which he is entitled in addition to the value of his lease apart from the buildings.

APPEAL by Lucius H. Beers and another, as executors, etc., of Robert R. Stuyvesant, deceased, from so much of an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 13th day of December, 1906, as overrules the objections of the said executors to the awards of the commissioners of estimate and assessment as to damage parcel No. 85

*Henry De Forest Baldwin*, for the appellants.

*Frank O'Connor*, for the respondent.

INGRAHAM, J.:

The property which has occasioned this controversy is located upon Chrystie street in the city of New York. It had a frontage of sixty-eight feet nine inches on Chrystie street upon which there had been erected a building or buildings, and of this sixty-eight feet nine inches, the northerly fifty-two feet were taken in this proceeding, leaving the owner sixteen feet nine inches. The owner of this property also owned a lot fronting on Delancey street which was included in the property taken, and the commissioners awarded for No. 13 Delancey street and Nos. 145 and 147 Chrystie street, together, to the owner $49,500, and to the lessee of this property the sum of $86,000, which was divided as an award for the buildings of $71,000, and for what was called the leasehold $15,000. To that report the owners filed their objection that the award made to the lessee on account of the unexpired term of the leases held by him on properties Nos. 145 and 147 Chrystie street included in damage parcel No. 85 was greatly in excess of the fair market value of the unexpired term of said leases ; *second*, that the award made to the owners for the land included in the parcel designated

First Department, July, 1907..    [Vol. 120.

damage parcel No. 85 is inadequate and much less than the fair interest of the owners in the premises taken at the time of the vesting of title in the city of New York and not due compensation for damages sustained by said taking; and, *third*, that the commissioners adopted an erroneous method of estimating the value of the leasehold and the amount of the award for said leasehold to be paid to the lessee. The property vested in the city of New York in pursuance of a resolution of the board of estimate and apportionment on the 28th day of July, 1903. These objections were overruled by the Special Term and the report confirmed, and there is presented on this appeal the question as to the correct method of ascertaining the interest of a lessee of real property taken under the right of eminent domain.

The property in question was, at the time the title vested in the city, owned by one Robert R. Stuyvesant who had on the 5th day of July, 1899, leased it to Adolph Schlessinger by three leases for twenty-one years with covenants for two renewals of twenty-one years each. These leases were identical in form and the rent reserved for the term was $1,650 a year, the tenant to pay all taxes, assessments and other charges. There is no question raised as to the value fixed by the commissioners upon the property as a whole, but the owners object to the award made for the value of the leasehold of $15,000 in addition to the award made to the lessee for the value of the buildings erected upon the property. In this discussion, therefore, we may assume that the total value of the land and the buildings was properly fixed by the commissioners.

The commissioners awarded the landlord $49,500, but this included his interest in the Delancey street property. It would appear from the award and the testimony that the commissioners fixed the value of the fee of the land of the Chrystie street property at $42,500, and of this amount awarded the tenant $15,000 and the owner $27,500. This would make the total value of the Chrystie street property as fixed by the commissioners $113,500, of which the tenant was awarded $86,000 and the owner of the fee $27,500. Before the commissioners the owners conceded that the tenant was entitled to whatever award should be made for the buildings and the question as between the landlord and tenant seems to have been confined to the amount that should be awarded to the

lessee, in addition to what was considered to be the value of the buildings, as the value of the leases. Upon this question experts were examined by both the landlord and tenant, and they attempted to fix the value of the lessee's interest in the property upon calculations as to the amount of rent paid to the owners and as to the amount of rent which the tenant was able to collect from his subtenants; and the different theories upon which these experts based their judgment is illustrated by the remarkable conclusions at which they arrived. The expert for the tenant estimated the unexpired term of the leasehold interest on the day the title vested in the city at $130,662.03, being some $17,000 more than the total value of the property as found by the commissioners for buildings, lessee's interest and lessor's interest. So far as I understand, the accuracy of his mathematical computation is not disputed, and if the value of the leasehold could be correctly estimated by such a method I do not see that the owner has suffered any damage, and yet he was in receipt of a net rental of $1,650, with the probability of a considerable increase when the lease came to be renewed. It is only fair to say, however, that this witness estimated the entire property as worth $141,646, so that in his opinion the value of the fee of the property subject to the lease was about $11,000. The expert called for the lessors testified that the market value of these leases if offered for sale would be about $3,500. This element of market value did not seem to include any interest in the buildings upon the property as the parties had by their apparent acquiescence agreed that an award for the buildings should be made to the tenant. But in the view I take of the proper method by which the value of a lessee's interest in real property is to be ascertained, it seems to me that it is impossible to eliminate the value of the buildings upon the property and treat the lease as a lease of unimproved property. In considering the method to be adopted in ascertaining the value of the interest of a tenant of real property for a term of years, we must first obtain a clear idea of the situation. Stuyvesant was the owner of a plot of land, and as such owner he was entitled to the use of the property, and it could not be taken from him except for public use, and then only upon paying him its full value. In 1899 he leased that property to one Schlessinger for twenty-one years, with a covenant of two renewals

First Department, July, 1907.                    [Vol. 120.

of twenty-one years each.    Certain rent was reserved, the tenant to pay all taxes, assessments and other charges and to erect a building or buildings upon the premises.    At the end of the twenty-one years the landlord was to have the privilege of purchasing the buildings at an appraised value or granting a new lease at a rental to be based upon five per cent of the value of the property as unimproved property. At the end of this first period of renewal the landlord had a similar option, either to purchase the building or to grant a new lease, and at the expiration of the second renewal all improvements upon the property were to belong to the landlord.    In 1903, about four years after the execution of this lease, the city of New York took the property, and was, therefore, to pay to whoever owned it its fair value at that time.    That value was to be ascertained, not by an examination of the profits of the business carried on in the buildings or the use to which the buildings could be put, or the value of the buildings to the owner as a business site, but the fair market value thereof, the price for which the property could be sold, and as against both the owners of the property and the tenant that selling price or actual market value is fixed as the amount that the city is required to pay, and it stood in place of the property.    Now, it is clear that both the owners and the tenant had an interest in the property, their total interest being represented by the amount that had been ascertained as the actual value of the whole property. The owner of the fee owned the property, and had granted an estate for years to the tenant.    When the question of distributing this award as between the tenant and the owners of the fee arose, it is apparent that the first question was to ascertain what was the value of the tenant's interest in the property, for that having been granted by the landlord or owner of the fee, was to first come out of the amount to be paid for the property as a whole.    It seems to me perfectly clear, however, that the only correct method of ascertaining the value of the tenant's interest was to proceed upon the same basis as in ascertaining the value of the whole property, and that is to ascertain just what the market value of the leasehold interest was at the time the property was taken.    To ascertain that, it was necessary to apply the same rules as had been applied in ascertaining the market value of the property as a whole.    The buildings that had been erected upon the property had become a part of the free-

hold, and could no longer be treated as a separate identity apart from the freehold, and both the landlord and tenant had an interest in them as well as in the land itself.   The tenant's interest was not an interest in the ownership of the buildings detached from the land, but an interest in the real property which consisted of the land and buildings; and it was, therefore, the duty of the commissioners to ascertain what was the market value of this interest of the lessee, not based upon the value of the buildings or what the lessee was able to make out of the buildings, but an inquiry simply as to what it was worth in the market as a piece of property. The fact that to ascertain such a value involved more or less difficulty is no reason why it should not be fairly met and determined.   What was taken by the city was this property.   In it the lessee had an interest. That interest the city must pay for, and that interest must be ascertained by the same methods used in ascertaining the value of the property taken as a whole.

It is quite evident that the commissioners, largely, I think, as the result of the attitude taken by counsel for both the land and the tenant, applied an entirely wrong principle in determining this question. They considered that the buildings as distinct from the real property belong to the tenant and then proceeded upon some theory which is certainly not based upon any evidence before them to fix in addition to the value of the buildings some value in the lease as a lease without the buildings.   Whatever may be said of the difficulty of ascertaining just what the tenant's interest in this property as a whole was, it certainly was much less difficult than to ascertain what was the value of a lease of this property as distinct from the occupation and ownership of it as it was occupied.   But it seems to me perfectly clear that the only method which will do justice is to ascertain just what interest the tenant had in the lease as a whole, considering the rent he pays, the obligations that he has and will assume under his lease and just what that interest is worth and what its market value is, and that having been ascertained award that amount to him as the value of the property taken, the remainder, of course, to go to the landlord.

An examination of the authorities shows that this is the rule that has been uniformly adopted when this question has come before the

First Department, July, 1907. [Vol. 120.

courts. The proper method of ascertaining the value of a lease was presented to this court in *People ex rel. D. & H. Co.* v. *Feitner* (61 App. Div. 129 ; affd., on opinion below, 171 N. Y. 641). What the court had to do in that case, as is necessary to be done in this, was to ascertain the value of a lease of real property, and it was held that the interest of the lessee in the property was the actual value of the leases and that this had no relation to the value of the property leased. In *Clarkson* v. *Skidmore* (46 N. Y. 297) the question presented was as to the apportionment of certain surplus moneys realized from the sale of mortgaged premises which were subject to a lien. Discussing the question as to the value to be awarded to the lessee the court said : " The lessee as between himself and his lessor, had a right to the possession and enjoyment of the whole of the premises during the residue of the term of his lease, being six years, subject only to the payment of the rent reserved in the lease and of the annual taxes which he had agreed to pay. * * * To the extent of the value of the rights thus vested in the lessee, the lessor had, by giving the lease, diminished the value of his own estate. * * * If the rent reserved in the lease was equal to, or more, than the annual value of the premises, then the estate of the lessee was manifestly worthless ; but if on the contrary, as appears to have been the fact, the annual value of the property was much greater than the rent reserved in the lease, the estate of the lessee was of importance, and a serious incumbrance on that of the lessor ; and the lessee is entitled to receive its equivalent out of the surplus of the proceeds. * * * The value of the term must depend upon the circumstances of every individual case ; the length of the term and conditions of the lease, the character of the property, its location, the readiness with which it may be let, the condition of the buildings, whether substantial and durable, or requiring frequent repairs, the uniformity of rents in the neighborhood or their fluctuating character ; in short, every material consideration which would enter into the mind of a purchaser of the term, in judging what would be a fair price for it, and, like other ordinary questions of value, should be determined, as a matter of fact, upon the testimony of witnesses competent to speak upon the subject." In that case, as in this, the lessee had made valuable improvements upon the premises after the com-

mencement of his term.  There was no suggestion, however, that
he was entitled to be repaid the value of the buildings that he had
erected upon the demised premises, but it was the value of the estate
of the lessee secured to him by the lease to which he was entitled.
And *Clarkson* v. *Skidmore* (*supra*) was followed in *Larkin* v.
*Misland* (100 N. Y. 212), where it was held that the lessee was not
entitled to share in the surplus moneys realized from the sale
of the leasehold premises in the absence of evidence that the value
of the leasehold estate was in excess of the rent reserved.  The
court said: " In the absence of proof to the contrary, the rents
reserved must be presumed to be the fair annual value of the use of
the land."  And this same rule has been applied without exception,
so far as I can ascertain, where property subject to a lease has been
taken under the right of eminent domain.  In *Matter of William
& Anthony Streets* (19 Wend. 678) the property to be taken was
subject to a lease with two covenants for renewal.  It was there
held that a lessee was entitled to be paid the value of his lease, and
in discussing the question the court said: " For the purpose of
illustration, we will take a case in which the whole of the property
is required for the contemplated improvement.  The value of the
land is the measure of damages.  If the ownership of the prop-
erty is divided between a landlord and his tenant, each may sustain
a part of the loss, and will be entitled to a portion of the compen-
sation and recompense.  If the rent reserved is equal to the full
annual value of the property, and there is nothing else to affect the
question, the landlord will be entitled to all the damages.  The ten-
ant loses nothing, and is, consequently, entitled to nothing — or at
most only to a nominal sum.  But if the rent is less than the annual
value, the tenant sustains a portion of the loss.  *  *  *  The value
of the term, whether long or short, may be affected by other stipu-
lations in the contract than those directly relating to the rent.  If,
for example, the tenant is to pay taxes, the amount of that burden
constitutes a part of the price which he pays for the enjoyment of
the property.  So, if the tenant agree to make erections or other
improvements on the land which will endure beyond the term, the
value of his interest in the property is plainly diminished, and that
of the landlord increased by the covenant."  And the same prin-
ciple was expressly recognized in *Matter of New York, West Shore*

& B. R. Co. (35 Hun, 633) where the rule is stated : " The lessees are entitled to receive as their damages the value of their term and the balance belongs to the remainderman." (See, also, *Matter of Commissioners of Central Park,* 54 How. Pr. 313.)

I have not been able to find any case in which this principle has been departed from, and I think it should be applied in all cases where property subject to a lease is taken under the right of eminent domain. The commissioners having first ascertained the value of the property as a whole are then required to apportion the amount thus determined among the several parties who are interested in the property. Where the property thus taken is held under a lease the value to the lessee of his estate in the property is to be determined, and that value is to be ascertained upon the same principles that are applied in ascertaining the value of the property as a whole. What is to be ascertained is the fair market value of the lease. Undoubtedly all the elements of a lease can be considered, and in addition the testimony of experts who are to testify as to the market value of the lease with the covenants, conditions and obligations imposed upon the landlord and the tenant, and it is this market value to which he is entitled.

As the commissioners manifestly proceeded upon a wrong theory in determining these damages, I think the order appealed from must be reversed, with ten dollars costs and disbursements to the appellants, and the report sent back to the commissioners to determine the value to the lessee of this lease as a whole in accordance with the principles above indicated.

McLAUGHLIN, LAUGHLIN, CLARKE and SCOTT, JJ., concurred.

Order reversed, with ten dollars costs and disbursements to appellants, and report sent back to commissioners to determine value to the lessee of the lease as a whole in accordance with the principles expressed in opinion.